# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

RICK MELVILLE,

               Plaintiff,

        -vs-                       Case No.   13-CV-755

FLOYD MITCHELL, STEVE JOHNSON,
RONALD MOLNAR, HEATHER PAULSEN,
SGT TREMAINE, and CAPTAIN CAIRA,

               Defendants.

## DECISION AND ORDER

        The *pro se* plaintiff, Rick Melville ("Melville"), is a former Wisconsin state prisoner who filed this civil rights action pursuant to 42 U.S.C. § 1983. The Court granted his petition for leave to proceed *in forma pauperis* on an Eighth Amendment failure to protect claim based on his allegations that the defendants placed him in a cell with an inmate with a well-documented record of sexually assaulting his cellmates, and that the inmate did sexually assault Melville. The defendants have filed a motion for summary judgment. The Court will grant the motion for the reasons explained herein.

### STANDARD OF REVIEW

        "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th

Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## FACTS[1]

Melville was incarcerated at the Milwaukee Secure Detention Facility (MSDF) on the evening of August 19, 2012, when his cellmate, Anthony Gray, allegedly stuck his hand down Melville's pants and grabbed his penis while Melville slept. Melville reported the incident the following morning.

At the time of the incident, defendant Floyd Mitchell was employed by MSDF as the Warden; defendant Steve Johnson was Security Director; defendant Ron Molnar was a Unit

---

[1] Facts are taken from the Defendants' Proposed Findings of Fact. Melville did not respond to the defendants' proposed fact as directed by the Local Rules. *See* Civil L.R. 56(b)(2)(B) (E.D. Wis.). He did, however, address some of the defendants' facts. (ECF No. 141-1 at 21-23.) This document is not sworn and does not cite to the record. The defendants' proposed facts are therefore undisputed.

Supervisor; defendant Vincent Caira was a Captain; defendant David Tremaine was a Correctional Sergeant; and defendant Heather Paulsen was an Institution Complaint Examiner (ICE) and Prison Rape Elimination Act (PREA) Investigator.

**A. Defendant Paulsen's Investigation into Melville's allegations**

Defendant Paulsen was assigned to conduct the investigation into Melville's sexual assault allegations. On August 20, 2012, she interviewed Melville in the law library of Unit 8C. Melville informed Paulsen that the night before, while he was asleep, inmate Gray "pulled [his] waistband up, put his hands in [Melville's] pants, reached for the tip of [his] thing, and [he] woke up to that." (Paulsen Aff. dated 7/9/14 ¶ 28, Exh. 1001 at 2.) Inmate Gray was taken to segregation and placed in Temporary Lock Up (TLU) shortly after the incident was reported the following morning. Melville asked to see someone from the Psychological Services Unit (PSU) right away, and Dr. Amy Graf came to speak with him. Dr. Graf asked him if he wanted to be moved to another unit and he replied no. Dr. Graf later told Paulsen that Melville had wanted to be placed in a single cell.

Defendant Paulsen interviewed inmate Gray on August 21, 2012. She asked if he knew why he was in segregation and he stated, "my celly said I put my hands in his pants or some shit like that." (Paulsen Aff. dated 7/9/14 ¶ 53, Exh. 1001 at 3; Exh. 1010.) Gray stated the first he knew about any of this was when the captain came to get him to place him in TLU. Gray had apparently told Melville "I am gay," but did not have any conversations with him regarding his being gay. Gray stated that Melville was "weird" and that he was only in the cell with him for three or four days and he was "talking to himself."

Defendant Paulsen asked inmate Gray why he thought there would be an accusation

3

against him like this. He explained that he had previously been placed in segregation for getting into a fight in which the other inmate was telling people on the unit he had tried to touch his penis, and that this was a known rumor on the unit. Gray also told Paulsen that he never gets up at night because he takes Amatriptyline, a medication used to help sleeping disorders. He stated he would "be out" all night after taking it. Health services records confirmed he had taken his dose the evening of August 19, 2012.

Defendant Paulsen concluded that Melville's allegations were unsubstantiated. She noted that Melville clearly had an issue with gay people, consistently referring to them negatively. She also believed Melville was making an allegation as an opportunity to try to obtain a single cell. Melville stated that he would have hurt inmate Gray for doing something like this but he did not want to go to segregation, which would limit his contact with his daughter. According to Melville, the known rumor on the unit was that Gray had done this before. Therefore, it would be simple to accuse him again. Since Gray had come out as gay to his fellow inmates, he could be a target.

## B. Paulsen's Investigation - Reopened

Shortly after defendant Paulsen thought she had completed her investigation, she learned that another inmate, Jose Hernaiz-Vargas, had recently reported that inmate Gray had sexually assaulted him. On August 21, 2012, Hernaiz-Vargas reported to Officer Fredericks that two weeks prior, he was on the 8C housing unit playing dominoes with inmate Gray when Gray grabbed his leg under the table and started running his hand up it. Hernaiz-Vargas had pulled back from the table and walked away. He chose not to report the information until after he learned about Melville's incident when he learned that Melville had not been moved to segregation.

Upon learning this new information, defendant Paulsen searched inmate Gray's

4

classification reports and learned that he had received multiple maximum custody placements and conduct reports over the years at different institutions. She asked Gray if any of placements or conduct reports were due to his inappropriately touching someone and thereby causing a fight. Gray responded that "not all of them" were related to touching. (Paulsen Aff. dated 7/9/14 ¶ 83, Exh. 1001 at 6.) Paulsen then reviewed the Classification Reports and Gray's current information in more detail and learned that he had been the subject of one PREA investigation at MSDF in July 2012, two PREA investigations at MSDF in 2010, and two PREA investigations at Racine Correctional Institution in 2008. Not one of the various prior investigators had found the allegations of sexual assault to be substantiated.

In defendant Paulsen's final conclusion, she revised her earlier findings. In each of the previous cases it had appeared to be the alleged victim's word against inmate Gray's. Thus, she could see why none of the previous investigators had substantiated the allegations. However, looking at all of the allegations together, Paulsen concluded that Gray was a predator with exceptional skills at picking his victims and knowing just what to say when confronted in order to avoid detection. In several of the incidents, Gray used the excuse that he could not have committed the acts because he was on medication that helped him sleep at night. Further, in most of the investigations he used his sexual preference as a reason that other inmates would make up stories because they did not want to be housed with him. As a whole, Paulsen determined that her investigation had substantiated the allegations made by Melville.

Inmate Gray received a conduct report on August 29, 2012 for Sexual Conduct in violation of Wis. Admin. Code § DOC 303.15, based on the accusations of three separate inmates during his current incarceration and prior PREA related allegations. He was given 180 days in

disciplinary separation as a result.

**C. Lack of Warning**

Melville and inmate Gray were cellmates in Unit 8C from August 16, 2012 through August 20, 2012. In the five days that they were cellmates, Melville had no problems with Gray. He did not voice concerns to any of the defendants. The defendants were not aware that Gray posed any kind of danger to Melville.

MSDF has an extremely high turnover rate for its inmates, who are mostly there on probation/parole holds. In fact, inmate Gray was only at MSDF for six months in 2010, and seven months in 2012. Once an inmate is revoked, if he receives a sentence longer than one year he is transferred elsewhere. This meant that security staff at MSDF did not get to know their inmates as well as they would have in other institutions. It also meant that social services files containing disciplinary histories were not kept on site for a majority of the inmates, including Gray.

In addition, PREA investigations are considered confidential, and are only shared on a need-to-know basis with correctional staff. If an allegation had been determined to be unfounded, there was no reason for the line officers or managers to be informed about it.

In the end, despite the investigations, inmate Gray was able to slide in under the radar of all of the defendants. It was only after there was a quick succession of three sexual assault allegations in July and August of 2012 that defendant Paulsen determined that Gray may in fact have been assaulting other inmates since 2008.

**D. Prior Investigations**

**1. 2012 Sexual Assault Allegation**

Until being named as a defendant in this lawsuit, defendant Johnson had never been

given any information to suggest that inmate Gray had a history of sexually assaulting other inmates. The only investigation defendant Johnson was previously made aware of was a July 2012 investigation into Gray in which Captain Claus (not a defendant) concluded that no sexual assault occurred.

Captain Claus was responsible for investigating the allegation of sexual assault on an MSDF inmate made against inmate Gray in July 2012. Defendant Johnson was not involved in the investigation. His only knowledge of this investigation comes from a July 9, 2012 memo he received from Captain Claus after he completed his investigation.

In this memo, Captain Claus told defendant Johnson that an inmate had pushed the intercom button and reported that inmate Gray needed to be removed from his cell. Officer Fitzgerald went to the cell and observed that Gray was bleeding from his nose and the side of his face. The inmate who had called for Officer Fitzgerald told him that he hit Gray because Gray was rubbing his penis while he was lying in his bunk on his back. Gray denied it. Both inmates were placed in TLU pending an investigation. Captain Claus explained to Johnson in the memo that he did not believe that a sexual assault occurred for a number of reasons. First, normally an assault like that occurs in the dead of night when the victim is asleep, not just before standing count and the evening meal. The victim was wide awake and alert, and the cell would have been well lit. There also had been rumors that Gray had homosexual tendencies. These type of rumors tend to make cellmates on edge. Also, the alleged victim was seven inches taller and twenty-five pounds heavier than Gray. Captain Claus reviewed Gray's classification summary to see that he is a convicted sex offender, but those cases were over twenty-five years ago. This was the extent of the content in the memo. (Johnson Aff. dated 07/09/2014 ¶ 39, Exh. 1004.)

7

In July 2012, PREA investigators were only required to provide defendant Johnson with a synopsis of their investigation via a memo. Johnson did not require them to provide him with any underlying documentation related to their investigation. Sometime after July 2012, Johnson began requiring PREA investigators to use the DOC 2135 form (titled "DAI Investigations-Confidential") to document their investigations. See exhibit 1009. This form allows for Johnson to see more information, such as an evidence log, what interviews were done, the content of the interviews, and incident reports that were created. The DOC eventually followed suit and began requiring the DOC 2135 form be used system-wide.

Johnson signed Conduct Report 2260309 that was issued to the reporting inmate on July 19, 2012 for hitting Gray. The conduct report was written by Officer Fitzgerald. The memo from Captain Claus and the conduct report issued to the reporting inmate were the only documentation Johnson received regarding the allegations made against inmate Gray in July 2012. Johnson has not received any additional correspondences or documentation regarding either the July 2012 allegations or other sexual assault allegations against Gray arising out of MSDF or any other institution.

Based on the single unsubstantiated allegation of sexual misconduct from July 2012, defendant Johnson had no reason to believe that inmate Gray posed a danger to other inmates. Captain Claus interviewed the people involved, analyzed the evidence, and reasonably concluded the allegation were unfounded. In this instance, the victim was using the sexual assault as a justification for hitting Gray. It is not unusual for inmates to make up reasons to justify a fight. As Security Director, Johnson has to rely on the investigations of his staff and the reasonable conclusions that they make at the conclusion of their investigations.

Defendant Mitchell would not have been made aware of the results of the July 2012 investigation into the allegations of sexual assault made against inmate Gray because the investigator concluded that no sexual assault occurred. While Mitchell likely would have reviewed an incident report if one were completed based on these allegations, due to the passage of time and the number of incident reports Mitchell reviews, he does not recall reviewing any regarding this incident. Similarly, due to the passage of time and the number of TLU placements every year, Mitchell does not recall if he was made aware of any TLU placements regarding the incident. There were 634 TLU placements in 2012.

However, since being named as a defendant in this lawsuit, Mitchell has reviewed the memo written by Captain Claus to defendant Johnson regarding his investigation and has concluded that even if he had known about the investigation it would not have given him any reason to use special precautions with respect to inmate Gray. As Warden, Mitchell has to trust his Security Director to properly oversee investigations and alert him to any particular concerns in which Mitchell needs to become involved. Mitchell was not alerted of any reason to become involved in this investigation.

### 2. 2010 Sexual Assault Allegations

Prior to Melville filing this lawsuit, defendant Caira's only knowledge of inmate Gray's alleged history regarding sexual assaults was based on two investigations he conducted in 2010. In 2010, Gray was at MSDF as a Department of Community Corrections probation/parole hold. He had arrived at MSDF on February 22, 2010.

The first investigation stemmed from alleged incidents that occurred in April, 2010 on 4 North, A pod. During defendant Caira's investigation, he learned that one inmate, who he will

refer to as Inmate A to protect his privacy, accused inmate Gray of standing near his bed on several occasions over the course of one week, and that Inmate A's roommate had seen Gray one of those nights with one hand in his own pants and one hand on Inmate A's bed. As a part of the same investigation, Caira then learned that around that same time there had been another allegation by a different inmate (who he will call Inmate B), who allegedly had been awoken by a touch on his right butt cheek, to find Gray rushing toward the door. He believed Gray had grabbed him on his right butt cheek, over his pants while he was asleep. Gray was taken to segregation and put on TLU. Gray wrote a lengthy statement in his defense explaining that the other inmates knew he was gay and were retaliating against him for refusing a sexual advance and hoping to get him kicked out of the program. Gray said that Inmate A then got Inmate B to lie about him.

At the completion of defendant Caira's investigation, he found the allegations against inmate Gray to be unfounded. After interviewing all of the inmates who were in the cell when both alleged incidents occurred, there were no corroborating stories. Each time an incident occurred, the alleged victim stated that there was another inmate present. Upon interviewing the suspected witnesses, they stated that they did not see or hear anything. Therefore, Gray was placed back into general population on a different floor. The investigation was signed by then-Security Director Ione Guillonta and then-Warden John Husz. Because the allegations were deemed unfounded, there would have been no reason to share this investigation with anyone else in the institution.

The second investigation stemmed from an alleged incident that occurred on May 17, 2010, in 8 North A-pod. During defendant Caira's investigation, he learned that inmate Gray had gotten out of bed to go to the bathroom, and when he returned to his bunk, he allegedly lifted up his cellmate's covers and reached in and touched his cellmate's thigh. The incident was reported to

Sergeant Rushford. Gray denied the incident. Caira was unable to interview the alleged victim because he was released on May 19, 2010. As a result of Caira's investigation, he determined that the allegations against Gray were unfounded. Gray was kept in general population and no conduct report was written. The investigation was signed by then-Security Director Ione Guillonta and then-Warden John Husz. Because the allegations were deemed unfounded, there would have been no reason to share this investigation with anyone else in the institution.

Based on defendant Caira's knowledge of the unfounded allegations made against inmate Gray in 2010, he would not have had any reason to believe there was a substantial risk of serious harm to other inmates by Gray. The precautions Caira took were reasonable given his knowledge of Gray at the time. Caira did not become aware of any other allegations of sexual misconduct made against Gray following those 2010 investigations until he was named as a defendant in this lawsuit.

After being named as a defendant in this lawsuit, Mitchell was made aware of two investigations in 2010 that Captain Caira conducted after inmates alleged that Gray sexually assaulted them. Mitchell was not aware of these investigations or any underlying documents associated with the investigations previously, nor would Mitchell have had reason to be. Mitchell was not employed at MSDF at the time of the investigations and was not involved in them in any manner. Even if Mitchell had been aware of the investigations, he would have had no reason to take any kind of precautionary action as a result. Since being named as a defendant in this lawsuit, Mitchell has reviewed the documents from the two investigations. There is nothing in the investigations that would have caused him any concern. Captain Caira deemed the allegations to be unfounded, and Mitchell would have had no reason to doubt those findings. In both investigations,

Captain Caira interviewed witnesses, analyzed the evidence, and came to reasonable conclusions.

After being named as a defendant in this lawsuit, Johnson was made aware of two investigations in 2010 stemming from allegations by inmates that Gray had sexually assaulted them. Both investigations were conducted by Captain Caira. Johnson was not aware of these investigations or any underlying documents associated with the investigations previously, nor would Johnson have had reason to be. Johnson was not Security Director at the time of the investigations and was not involved in them in any manner. Even if Johnson had been aware of the investigations, he would have had no reason to take any kind of precautionary action as a result. Now that Johnson has reviewed the investigations, he can confirm that there is nothing in them that would have caused him any concern. Captain Caira deemed the allegations to be unfounded, and Johnson would have had no reason to doubt those findings.

### 3. 2008 Investigations

When defendant Paulsen was investigating Melville's allegations, she discovered there had also been investigations done into sexual misconduct by inmate Gray in 2008 when he was an inmate at Racine Correctional Institution. Johnson and Mitchell were not made aware of these investigations prior to Paulsen's discovery of them in the course of her investigation into Melville's allegations.

### E. Personal Involvement

### 1. MSDF - Entry and Classification

MSDF is a high-rise, medium-security correctional facility in downtown Milwaukee. Most inmates at MSDF are Division of Community Corrections inmates. MSDF has a capacity of 1,040 felony offenders, with 730 secure detention beds that are medium-security and function as a

holding facility for DCC inmates. These inmates could be completing programming or a sanction, or are incarcerated due to probation/parole/extended supervision holds and are awaiting possible revocation. MSDF also houses offenders from Milwaukee County, who were sentenced by local courts to the DOC and are awaiting transport to the Dodge Correctional Institution. MSDF also houses temporary lock ups ("TLU's") from local minimum-security prisons when their behavior warrants secure custody.

Rather than inmates remaining at MSDF for several years at a time, like at most prisons, the average stay in a general holding cell is 67 days. If an inmate is revoked and then receives a sentence of anything over one year, he is transferred out of MSDF to Dodge Correctional Institution. If the sentence is less than one year, it may be served at MSDF. Although it is a DOC institution, due to its more transient population MSDF functions in a similar manner to that of a jail operation. Unlike other DOC institutions, MSDF accepts offenders twenty-four hours a day and has an intake booking/objective classification process closely resembling that of a county jail.

The Intake Unit is responsible for efficiently processing all offenders in and out of MSDF. Upon their arrival, all offenders are given a shower, receive initial clothing, psychological assessment, medical assessment, offender photo ID, fingerprinting to identify each offender, and allowable property prior to being assigned to a housing unit. The only records initially available would be those provided by the Milwaukee County Jail or the inmate's probation/parole agent, which would state the reason for detention.

Within about one week of arrival at MSDF, a classification specialist will perform a short computer assessment to provide the unit with a number between 1 and 4 to classify an inmate's risk relative to criminal history, institution adjustment, escape history and detainers. The

13

higher risk inmates receive higher numbers. This classification system is unique to MSDF and is necessary because MSDF houses such a wide variety of inmates, from the extremely dangerous to the relatively harmless. The system gives the Intake Unit a starting off point given that they have little to go with when offenders arrive off of the streets.

MSDF attempts to keep inmates with similar risk levels housed together. Previous investigations into misconduct that were unfounded or unsubstantiated would not affect an inmate's classification number. When inmate Gray arrived at MSDF he was classified as a #2 and Melville as a #3. On 8C, where the two inmates were housed as cellmates, MSDF policy allows #2 and #3 inmates to be housed together.

The MSDF warden, security director and security staff are typically not involved in screening inmates when they arrive. If an inmate is known to be highly problematic, such as if he has numerous conduct reports for assaulting staff, then the warden and security director may get involved. However, the average offenders coming into MSDF are screened by HSU, PSU and a classification specialist, not the security director or warden.

Defendant Johnson was not involved in inmate Gray's screening. He was not flagged as a problematic inmate who required Johnson's involvement. This means the warden would not have been involved in that screening either.

## 2. Gray's Placement with Melville

As indicated, inmate Gray and Melville were cellmates in Unit 8C from August 16, 2012 to August 20, 2012. Defendants Molnar and Tremaine did not have any involvement in this placement. The decision to place these two inmates together would have been made by a correctional officer at intake.

Defendant Molnar does not know the name and history of every inmate on his unit. He is unfamiliar with inmate Gray. At any given time there are approximately 200 inmates residing on each floor. The turn-over rate on the units is extremely high. In general, as unit manager, Molnar tries to remain familiar with issues arising among inmates on the unit, general conditions, and climate on the unit. Molnar also relies on his subordinate staff to report issues arising on the unit. Molnar knows the name Melville, but he would not recognize him if he saw him on the unit.

Defendant Mitchell had no involvement with the placement of Melville and inmate Gray as cellmates. Mitchell had no knowledge that Gray posed any specific threat to other inmates, including Melville, such that he should not be double-celled. Mitchell was not given any information to suggest that Gray had a history of sexually assaulting other inmates or of assaulting his cellmates.

Defendant Johnson had no involvement in the placement of Melville and inmate Gray as cellmates. Johnson had no knowledge that Gray posed any specific threat to other inmates, including Melville, such that he should not be double-celled. Johnson was not given any information to suggest that Gray had a substantiated history of sexually assaulting other inmates or of assaulting his cellmates. Melville never contacted Johnson with regard to his cell assignment or requested to be moved from the cell he shared with Gray at any point. Johnson does not have any correspondence in his files regarding any requests or complaints of this nature.

Neither inmate Gray nor Melville was classified as an inmate who required a single cell assignment. The decision to place Gray and Melville together was made on the unit itself, not by Johnson. He had received no reports from any of his subordinates in the time that Gray and Melville were housed together that there were difficulties with the cell assignment or that either of

them had threatened the other.

### 3. Molnar and Tremaine's Lack of Knowledge of the Prior Gray Investigations

Before Molnar was made a defendant in this lawsuit, he was not aware of the 2008 and 2010 allegations that had previously been made against inmate Gray for sexual assault by his cellmates. As Molnar understands it, none of the previous allegations were found to be substantiated. PREA information is considered confidential, and is only shared on a need-to-know basis. When an investigation has determined that allegations are unfounded, that information would normally not need to be shared with Molnar. Molnar has had no personal involvement in any of these investigations.

Since being named as a defendant in this lawsuit, Molnar has reviewed the previous three investigations done into Gray's alleged sexual misconduct at MSDF. All of the investigations that were done prior to the one associated with Melville's August 2012 allegations, found the allegations to be unsubstantiated. Therefore, even if Molnar had been made aware of the previous investigations, as a Unit Manager, he would have had no reason to take special precautions with respect to Gray.

Tremaine does not remember if he was ever aware that Gray had been under investigation for sexual misconduct prior to August 2012. However, he would have had no reason to know about the investigations, given that they were considered confidential in nature. Since being named as a defendant in this lawsuit, Tremaine has reviewed the three previous investigations into Gray's sexual misconduct at MSDF. After reviewing them, Tremaine can say that they would not have put him on notice that Gray posed a danger to Melville. All previous investigations were deemed unfounded/unsubstantiated until Melville's August 2012 allegations arose. Therefore, even

if Tremaine had been made aware of the previous investigations, he would have had no reason to take special precautions with respect to Gray.

## ANALYSIS

The defendants contend that they were not deliberately indifferent to Melville's safety because they were not aware of any risk to Melville. They further contend that they had no reason to doubt the outcome of the prior investigations which had determined that allegations against inmate Gray were unsubstantiated. The defendants also contend that the Court should dismiss Melville's claim against them for lack of personal involvement. Lastly, the defendants contend that they are entitled to qualified immunity because there is no clearly established Eighth Amendment right protecting an inmate from being placed in a cell with someone who had been the subject of unsubstantiated allegations of sexual assault.

Melville contends that the defendants should have known that inmate Gray had a history of sexually assaulting other inmates. He further contends that defendant Caira's investigations into the 2010 sexual assault allegations were deficient.

As an initial matter, the Court will address Melville's assertions, made throughout his summary judgment responses, that he is untrained in the law and unable to effectively respond to the defendants' summary judgment motion without an attorney. The Court has considered Melville's motions for *pro bono* counsel in this case and determined that he could proceed on his own. Specifically, Melville has demonstrated that, while he is not an attorney, he is an effective litigator with a high level of competence in preparing and responding to motions. Melville's claim is not complex. He has conducted extensive discovery and filed a comprehensive response to the defendants' motion for summary judgment. The Court now turns to the merits of Melville's claim.

17

The Eighth Amendment imposes a duty on prison officials to protect prisoners from attacks by other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). An inmate can prevail on a claim that a prison official failed to protect him if the official showed "deliberate indifference"; that is, that the defendant was subjectively aware of and disregarded a "substantial risk of serious harm" to the inmate. *Id.*; *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008). To make a guard subjectively aware of a serious risk of attack, the inmate must communicate a specific and credible danger. Compare *Santiago v. Walls*, 599 F.3d 749, 758-59 (7th Cir. 2010); *Santiago v. Lane*, 894 F.2d 218, 220, 223-24 (7th Cir. 1990); *Young v. Selk*, 508 F.3d 868, 873-74 (8th Cir. 2007); *Horton v. Cockrell*, 70 F.3d 397, 401 (5th Cir. 1995); with *Dale*, 548 F.3d at 569 (prisoner's "vague statements that inmates were 'pressuring' him and 'asking questions'" were insufficiently specific to put guards on notice that he was in danger). But even when he is aware of a substantial risk of serious harm to an inmate, a prison guard is not liable if he responds reasonably to the risk, whether or not his response ultimately prevents the harm. *Farmer*, 511 U.S. at 844; *Borello v. Allison*, 446 F.3d 742, 747-48 (7th Cir. 2006).

In this case, it is undisputed that the defendants did not know that inmate Gray posed a risk to Melville in August 2012 when they were cellmates. Melville does not allege that he tried to warn anyone about the risks he faced by being placed with Gray. According to Melville, he "never made complaints about his cell assignment with Gray because he did not know he would be another victim of Gray's, nor did he have prior knowledge of Gray's sexual assault conduct (which defendants had a responsibility to know) nor did Melville know of Gray's sexual preference." (ECF No. 141-1 at 22.)

Melville contends that the defendants should have known that inmate Gray posed

a risk to him and that he never should have been placed in a cell with Gray. However, the Eighth Amendment is not satisfied by what the defendants should have known but rather by what they did know. It is not enough that the guard ought to have recognized the risk; instead, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Riccardo v. Rausch*, 375 F.3d 521, 525-26 (7th Cir. 2004) (quoting *Farmer*, 511 U.S. at 837); *see also Grievesen v. Anderson*, 538 F.3d 763, 775 (7th Cir. 2008) ("the inquiry is not whether individual officers *should have* known about risks to Grieveson's safety, but rather whether they *did* know of such risks").

Defendants Mitchell and Johnson had knowledge of the July 2012 investigation conducted by Captain Claus who found the allegations against inmate Gray unsubstantiated. Defendant Caira had knowledge of the 2010 sexual assault allegations against inmate Gray. After conducting investigations into the allegations, he determined that they were unfounded.[2] However, these defendants' knowledge does not impose liability on them because it is undisputed that they were not involved in placing Melville in a cell with Gray and because Melville never complained to them that he feared for his safety once he was celled with Gray. In addition, the prior allegations were deemed unfounded and the investigations were unsubstantiated. *See Higgin v. Johnson*, 346 F.3d 788, 794 (7th Cir. 2003) (knowledge of two unfounded investigations does not equal knowledge or suspicion that the subject of the investigations was a probable sexual predator).

Melville contends that the investigations were faulty and that the defendants violated multiple prison policies during and after the investigations, leading to his assault. He also contends

---

[2] Mitchell and Johnson did not have knowledge of the 2010 sexual assault allegations until after this lawsuit was filed. Defendants Molnar and Tremaine did not have knowledge of the prior investigation in August 2012.

that defendant Caira's 2010 investigation raises major concerns such as gross negligence, total disregard of the facts, safety issues, and improper investigation. However, violation of state laws or regulations is not a basis for a federal civil rights suit. *See Guajardo-Palma v. Martinson*, 622 F.3d 801, 806 (7th Cir. 2010); *Domka v. Portage Cnty., Wis.*, 523 F.3d 776, 784 (7th Cir. 1984). Moreover, negligence is insufficient to impose liability: "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

Here, the undisputed facts reveal that the defendants were not aware that inmate Gray was a threat to Melville's safety prior to the August 2012 sexual assault. Accordingly, the Court must find in favor of the defendants on Melville's Eighth Amendment failure to protect claim. *See Grieveson*, 538 F.3d at 777 ("There is no genuine issue of material fact concerning the assaults Grieveson suffered at the hands of angry, unstable, violent inmates because there is no evidence demonstrating that any of the named officers knew about these threats to Grieveson's safety.").

## ADDITIONAL MATTERS

Melville has filed a motion for permission to serve interrogatories on non-parties (ECF No. 148). He states that he will not use this discovery at summary judgment. Rather, it appears that Melville sought to use the discovery at trial. However, this motion is now moot.

Melville has filed a motion to return original documents (ECF No. 157). He requests that the Clerk's Office return to him the original documents he has filed in this case. The Court previously advised Melville that he should retain his own copy of all documents he files. The Court is unable to return original documents to him. Melville may purchase copies from the Clerk's Office for $.10/copy.

Melville has also filed a motion to appoint counsel (ECF No. 158). This motion is now moot.

**ORDER**

**IT IS THEREFORE ORDERED** that the defendants' motion for summary judgment (ECF No. 128) is **GRANTED**.

**IT IS FURTHER ORDERED** that the plaintiff's motion for permission to serve interrogatories on non-parties (ECF No. 148) is **DENIED**.

**IT IS FURTHER ORDERED** that the plaintiff's motion to return original documents (ECF No. 157) is **DENIED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that the plaintiff's motion to appoint counsel (ECF NO. 158) is **DENIED AS MOOT**.

Dated at Milwaukee, Wisconsin, this 25th day of March, 2015.

**SO ORDERED,**

**HON. RUDOLPH T. RANDA**
**U. S. District Judge**